UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM ANDERSON,                    )
                                     )
              Plaintiff,             )    CIVIL ACTION NO.
                                     )    10-30123-DPW
v.                                   )
                                     )
UNITED PARCEL SERVICE, INC.,         )
                                     )
              Defendant.             )
                                     )

MEMORANDUM AND ORDER
March 29, 2012

In this action, William Anderson seeks compensation for what he alleges was his discriminatory termination by United Parcel Service, Inc., in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* UPS has moved for summary judgment, contending that Anderson was not qualified and capable of performing the essential functions of any available position he sought (or might have sought). Because the record before me discloses no genuine issues of material fact to contest UPS's contentions, I grant UPS's motion for summary judgment.

**I.  BACKGROUND**

A.  Facts

UPS is in the package delivery business. Anderson, who resides in West Springfield, Massachusetts, worked for UPS from 1986 to 2007, starting as a part-time loader/unloader and working his way up in the Springfield, Massachusetts and Hartford, Connecticut areas, through supervisor and manager positions.

In 2005, Anderson was diagnosed with bipolar disorder, and begin seeing a psychiatrist and therapist after being hospitalized and taking a seven-month leave of absence from UPS. When Anderson returned to work, he was assigned to work as a hub manager in Hartford, a position similar to his previous manager position.

In 2006, Anderson was hospitalized again and forced to take time off as a result of his bipolar disorder, and in January 2007 he was reassigned to manage preload activities in Springfield. Preload managers oversee the overnight package sorting and loading operations for UPS.  However, Anderson found the preload position very difficult and began having performance issues.  He had trouble remembering details, was lethargic and withdrawn, and the additional stress as the lone preload manager working an overnight shift exacerbated the effects of his bipolar disorder.

According to Dr. Jaffe, Anderson's treating psychiatrist, Anderson's bipolar disorder caused him to experience difficulty concentrating, anxiety, panic attacks, decreased energy, and depression.  Dr. Jaffe also opined that working a night shift would significantly impair someone with bipolar disorder, because inhibited sleep patterns increase the likelihood of bipolar episodes (mania or severe depression).  Dr. Jaffe further opined that Anderson should not work more than forty-five hours per week (nine hours per day, five days per week), and should not work

nights, except in rare circumstances.  Dr. Jaffe concluded that if the job restrictions he identified were met, Anderson could meet all of the "Essential Job Functions" UPS listed for supervisors and managers, and return to work.

During 2007, a co-worker gave Anderson's supervisor photos of Anderson asleep at work during his lunch break, and of Anderson's car after an accident.  As a result, Anderson's supervisor and Marge Niedbalski, a member of the Human Resources department, requested a meeting to discuss Anderson's performance issues.  During the meeting, Ms. Niedbalski explained that she did not want to talk about Anderson's bipolar condition.  UPS, she said, had set up a special committee to deal with accommodations under the ADA and she was not a part of that process.  Instead, she focused on Anderson's performance issues.

After the meeting, Anderson sent his supervisor a letter stepping down from his Springfield preload manager position.  He requested a transfer to a day supervisor position with less stress, or to a different assignment if no day supervisor positions were available, but he did not specify any open positions in his letter that he felt he was qualified and able to perform.  A transfer was not provided and Anderson took unpaid medical leave after another hospitalization for a panic attack.  Anderson did not return to UPS after May 14, 2007.

While he was on leave, Anderson received a questionnaire from the UPS ADA accommodation committee requesting information about the job functions that Anderson could no longer perform as a result of his bipolar disorder.  Anderson turned the questionnaire over to Dr. Jaffe, who did not fill out the form but instead sent a letter.  That letter was apparently lost, and the UPS ADA committee reiterated that they could not go forward without a completed questionnaire.  Dr. Jaffe again sent a letter instead of filling out the questionnaire, and spoke with an administrator to explain that he thought the questionnaire did not apply to Anderson because Anderson's only restriction was on the number of hours he could work.

Anderson's attorney, in a letter dated June 28, 2007, reiterated that Anderson was seeking to continue working at UPS, and identified five specific supervisor jobs that Anderson's bipolar disorder would not prevent him from performing.  The letter again emphasized that Anderson was "open to consider any other supervisor position" and "would not rule out any position subject to an examination of the compensation and benefits."

On August 6, 2007, the UPS ADA accommodation committee sent Anderson a letter stating that based on the medical information it had received, it was unable to conclude that Anderson was disabled under the ADA and thus eligible for a reasonable accommodation.  The committee concluded that because Dr. Jaffe

4

opined that Anderson could work as much as nine hours a day, five days a week, Anderson did not meet the test for disability in the ADA.  Anderson subsequently went through two more rounds of the UPS ADA process, but was unsuccessful in getting UPS to provide him with a supervisor position in light of Dr. Jaffe's stated hours limitation.  On July 28, 2008, Anderson was officially terminated by UPS.

B.    Proceedings

On February 1, 2008, Anderson filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") alleging that UPS had violated Massachusetts General Laws chapter 151B by failing to transfer him to another position.  At his hearing before the Commission, Anderson reviewed a list of positions that were available during his fourteen months of leave, and identified five positions he thought he could have worked if he had been given a transfer: (1) Comprehensive Health and Safety; (2) Area Human Resources Representative; (3) Health and Safety Supervisor; (4) On-Road Supervisor; or (5) Employment Supervisor. UPS presented evidence from employees in each of the five listed positions detailing the hours they worked, their job responsibilities, and the other routine requirements of their job.  None worked regular hours within Anderson's stated limits, and a number of incumbent employees testified to having unpredictable schedules that involved working night-shifts.

5

At the MCAD hearing, Dr. Jaffe also testified.  He
reiterated that although Anderson could work more than forty-five
hours on a rare, intermittent basis, a job that regularly
required fifty-five hour weeks would not satisfy his
restrictions.  Dr. Jaffe noted that there was a "critical
difference . . . between working long hours and having the
additional stress of being a manager and being responsible for
many other people."  Dr. Jaffe said that with a lower stress
position and if Anderson's bipolar disorder was "doing better,"
he would support Anderson working twelve-hour days, five days per
week for a month or two if Anderson thought he could handle it.

Anderson himself testified that when he was asking for a job
that was nine hours per day, five days per week, he did not mean
that he would never work more than nine hours per day; he said he
understood that jobs such as the On-Road Supervisor required
longer hours on occasion each week.

Anderson testified that in 2008 he began working again,
first for a pool company and then as an Assistant Manager at a
hardware store (his current position).  At the hardware store,
Anderson's job duties include working with customers, opening or
closing the store, checking staff levels and cash flows, and
monitoring employees.  Anderson works nine to ten hour shifts
when he opens or closes the store.  At points in his MCAD
testimony on November 6, 2009, Anderson gave conflicting answers

as to whether he was struggling at his new job as a result of his bipolar disorder. *Compare* Nov. 6, 2009 Tr. at 184 ("Q: . . . in your current position, you do on occasion struggle. Would you agree with that? A: Yes."), *with* Nov. 9, 2009 Tr. at 150 ("Q: And since the time that you've been working at [the hardware store], have you had any significant problems in your employment performance there? A: No, not at all."). Dr. Jaffe testified that he thought Anderson had struggled at times in the hardware store, but that the position was far less stressful and Anderson was doing the best he could.

The Hearing Officer in the MCAD proceeding held that under Massachusetts law, UPS should have transferred Anderson. UPS has appealed that ruling; and the appeal is pending.

Meanwhile, Anderson sought and received a right-to-sue letter from the EEOC,[1] and filed this action claiming discrimination under the ADA. UPS moved for summary judgment; Anderson opposed UPS's motion and filed a cross motion for summary judgment.

## II.  STANDARD OF REVIEW

A movant is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[1]  The ADA requires exhaustion of administrative remedies before suit may be brought on employment discrimination grounds. *See* 42 U.S.C. § 2000e-5(f)(1).

R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch. v. RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment.  *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).

I "view the facts in the light most favorable to the party opposing summary judgment." *Rivera–Colón v. Mills,* 635 F.3d 9, 10 (1st Cir. 2011).  Because I am addressing cross-motions for summary judgment, I "must view each motion, separately, through this prism." *Estate of Hevia v. Portrio Corp.,* 602 F.3d 34, 40 (1st Cir. 2010).

### III.  MOTION TO STRIKE

At oral argument on the UPS summary judgment motion, Anderson was given an opportunity to file a supplemental letter with citations to the record to support his new contention that part-time positions were available during the relevant time period.  On October 31, Anderson filed a supplemental submission that ranged far beyond citations to the summary judgment record submitted initially in connection with the motion.  UPS moved to

8

strike Anderson's submission because it was based on (1) evidence
not contained in the original record and (2) unauthenticated
evidence.

I made clear on multiple occasions during oral argument that
Anderson's submission should only contain citations to the record
then before the court.  Anderson's supplemental submission,
however, contains only two citations to the original record.  The
remainder, specifically the affidavits and exhibits attached to
his supplemental submission, was not part of the existing record.

Exhibits A and D to Anderson's submission are transcripts of
a March 19, 2009 deposition of Ms. Niedbalski for the MCAD
hearing.  However, that deposition is not found anywhere in the
summary judgment record before me.[2]  Exhibit B is a copy of Dr.
Jaffe's letter with attachments of (1) a letter from a "Denise
Corder" at Aetna and (2) a job description for an "Operations
Management Specialist."  These attachments are also not in the
summary judgment record me, nor have they been properly
authenticated.[3]  Without proper authentication, they would be

---

[2]  UPS contends that Ms. Niedbalski's deposition was not even
before the MCAD, because she testified in person in that
proceeding.

[3]  When shown the Operations Management Specialist "Essential Job
Functions" document at her deposition, Ms. Niedbalski could not
"say this is a corporate version of [the document] because
usually it should have a trademark and a date."  She did
recognize the functions listed as those of an Operations
Management Specialist, however.

inadmissible under Federal Rule of Evidence 901 although presumably this could be remedied by further filings.  Exhibit C is a new affidavit from Anderson himself.  That affidavit is also outside of the record as originally submitted.

Holding a party to the evidence submitted in connection with a summary judgment motion is not a hypertechnical requirement. In the absence of some showing that belatedly submitted materials constitute newly discovered evidence which could not have been provided in the regular submissions, entertaining such belated submissions threatens to turn a record designed rigorously to test evidentiary sufficiency into an amalgam of quicksilver. Apart from the desire to reframe his argument – upon which I had expressed some skepticism during the hearing on the motion – by revising and expanding the record, the plaintiff offered nothing that was not available at the time the summary judgment submissions were made.  I decline to permit him to change the evidentiary basis upon which the summary judgment motions were briefed and argued.  *Cf. Poulis-Minott v. Smith*, 388 F.3d 354, 357-59 (1st Cir. 2004) (affirming decision to strike portions of expert opinions disclosed after discovery closed, noting that the purpose of strict rules is "'to facilitate a fair contest with the basic issues and facts disclosed to the fullest practical extent'" (quotations and citations omitted)); *accord Tower Ventures, Inc. v. City of Westfield*, 296 F.3d 43, 45-46 (1st Cir.

2002) (noting that the First Circuit has "made it plain that a litigant who ignores case-management deadlines does so at his peril.  Consequently, when noncompliance occurs, the court may choose from a broad universe of possible sanctions").

Because Anderson's supplemental evidence, except for the two citations to the record, is a belated and uninvited effort to expand the record, I will grant UPS's motion to strike it. Moreover, as discussed in section IV.B. below, even if I were to consider these new submissions, they would be of no avail to Anderson because they fail to create a genuine issue of material fact for trial.

### IV.  MOTION FOR SUMMARY JUDGMENT

A.  ADA Overview

The ADA prohibits discrimination against "a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a). In order for Anderson to make out a prima facie discrimination claim, he must prove "that (1) []he suffers from a disability or handicap, as defined by the ADA; (2) []he was nevertheless able to perform the essential functions of [his] job, either with or without reasonable accommodation; and (3) the defendant took an adverse employment action against [him] because of, in whole or in part, [his] protected disability."  *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 99 n.7 (1st Cir. 2007).

As to the second prong of the prima facie test, Anderson must show that he was a "qualified individual," defined as someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that . . . [he] holds or desires."  42 U.S.C. § 12111(8).  Whether a job function is "essential" is determined by looking at numerous factors, including (1) the employer's judgment as to which functions are essential; (2) written job descriptions of the job prepared before considering applicants; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; and (6) the work experience of past and current incumbents of the job.  29 C.F.R. § 1630.2(n)(3).

UPS has moved for summary judgment on the ground that, even assuming Anderson was disabled under the ADA, he could not show under the second prong of the prima facie test that he was able to perform the "essential functions" of his job or any of the jobs to which he could have sought a transfer.[4]  UPS claims that flexible schedules, including the ability to work nights, and long daily hour requirements are "essential functions" of all of

---

[4]  The parties engage in extensive sparring over whether Anderson actually sought a transfer to a specific job.  The target jobs for transfer have been identified as those within the scope of Anderson's request which might have become available during the relevant time period.

the available jobs Anderson sought.  Thus, UPS asserts,
Anderson's inability to work nights and longer than nine hours
per day, five days per week except on a rare or intermittent
basis, prevents him from being a "qualified individual."

B.   Essential Functions

In order to survive summary judgment, Anderson must point to
some facts in the record which contradict UPS's affidavits or
otherwise create a genuine dispute about the "essential
functions" of the jobs he sought.  It bears emphasizing, however,
that "conclusory allegations, improbable inferences, and
unsupported speculation" are insufficient.  *Sullivan*, 561 F.3d at
14 (quotation and citation omitted).  Even after being given the
opportunity to provide this court with direct citations to the
record, Anderson could not point to anything sufficient to create
a genuine issue of material fact.  Therefore, his claim must fail
and summary judgment must be granted to UPS.

Anderson points to his own and to Dr. Jaffe's testimony
before the MCAD to create a genuine issue of material fact.
There, both he and Dr. Jaffe testified that the forty-five hour
restriction Dr. Jaffe had suggested in his letter to UPS was not
set in stone, and that for certain limited periods of time
Anderson might handle additional work time in positions less
stressful than that of a manager.  That testimony, however, is
insufficient to create a genuine issue of material fact for two

13

reasons.  First, it is conclusory and unsupported by the record.
Second, even if it were not conclusory, it would not create a
genuine issue of material fact because, taken as true, it is
clear from the evidence Anderson would still be unable to perform
the "essential job functions" of the positions he sought.

UPS has provided uncontroverted evidence going to at least
three of the six elements listed in the regulations for
determining whether a particular function is essential.  See 29
C.F.R. § 1630.2(n)(3).  UPS produced (1) a written description of
the essential functions of the types of jobs Anderson was seeking
that had been prepared before Anderson sought them, 29 C.F.R. §
1630.2(n)(3)(ii); (2) affidavits detailing the work experience of
past incumbents in the job, 29 C.F.R. § 1630.2(n)(3)(vi); and (3)
affidavits detailing the work experience of incumbents in similar
jobs, 29 C.F.R. § 1630.2(n)(3)(vii).  None of the factual
contentions provided by Anderson genuinely contradict any of
these.

i.   *Written Description*

The written description of the supervisor/manager positions
states that full-time positions require nine to ten hours of work
per day (or forty-five to fifty hours per week), but adds that
"extended hours may be required as service needs require," and
that these positions require the "[a]bility to work varying
shifts and extended hours as business needs dictate."  While

14

Anderson and Dr. Jaffe testified that Anderson could, for very limited periods of time, handle additional work beyond Dr. Jaffe's stated limitations, neither Anderson nor Dr. Jaffe have ever said that Anderson could work ten hours per day, varying shifts (including night shifts), or extended hours on anything but a rare, intermittent basis as required by the written job description.  It is therefore not meaningfully disputed that Anderson cannot meet the written job description's requirements.

    *ii.  Experience of Incumbents and Other Employees*

    Likewise, the affidavits from UPS employees in the positions Anderson sought or could have sought all explained that their jobs required hours and flexibility that Anderson and Dr. Jaffe have said Anderson could not handle.

    The Comprehensive Health and Safety position was a manager position, and therefore it would have been a lateral transfer to a position of similar responsibilities, not a "step down" to a less stressful supervisor level as Anderson had requested.  An affidavit from the human resources manager for the district affirms that

> the Comprehensive Health & Safety position was a
> manager level job and not a supervisor level job.  This
> position was at the same level as the Preload Manager
> position in Springfield, MA [that Anderson had
> previously held but said he could not do any more
> because the responsibility of manager positions was too
> demanding].  A transfer from Preload Manager to CHSP
> Manager would have been a lateral transfer and not a
> step down.

Anderson claims that this is "immaterial" because he identified the job as one he "believed he could fill." Nevertheless, in his letters to UPS, Anderson requested a transfer to a "day *supervisor* position" (emphasis added), not a manager position, and noted that it was "not fair to the preload to continue *as the manager*" (emphasis added).  Dr. Jaffe, in letters to UPS, said that Anderson's anxiety and depression is "largely related to the stress of working 12 hour days *as a manager,*" (emphasis added), and opined that Anderson "needs to step down from his position *as a manager* . . ."  The combination of Dr. Jaffe's letters with Anderson's request for a supervisor, not manager, position is enough to undermine Anderson's "belief" that the Comprehensive Health and Safety position was one that he could handle.

The Area Human Resources Representative from 2007-2010 testified that from March through December, he worked an average of eleven to twelve hours per day, or fifty-five to sixty hours per week.  He reported that he frequently worked outside of regular business hours, depending on operational needs, and sometimes worked into the night to cover for other supervisors who were required to leave after eight hour shifts.

The Health and Safety Supervisor's duties included performing safety audits, and conducting new driver orientation and various other types of training.  Her average schedule ranged

16

from twelve hours per day in non-Peak season to fourteen hours
per day in Peak times.  She frequently performed safety audits,
which covered aspects of all shifts (including night shifts) and
often lasted long periods of time, sometimes starting at 6:30am
and ending at 1:00am the following morning.  She also was
responsible for training for OSHA compliance three to four times
per month which required that she come to work either early in
the morning or at night.

The On-Road Supervisor worked between twelve and fourteen
hours per day during January through November, and about twelve
hours per day during December.  On-Road Supervisors were required
to ride with drivers between three and four days per week, from
the time they leave preload until they return at night.  To do
so, the Supervisor was required to obtain a commercial vehicle
driver's certification from the Department of Transportation,
which Anderson had not done.[5]

Finally, the Employment Supervisor was responsible for
recruiting, interviewing, hiring, and training new employees for
six buildings.  From January through March, the Supervisor worked
between ten and twelve hours per day.  From April through August,

---

[5]  Department of Transportation regulations state that "[a]
person is physically qualified to drive a commercial motor
vehicle if that person [h]as no mental, nervous, organic, or
functional disease or psychiatric disorder likely to interfere
with his ability to drive a commercial motor vehicle safely."  49
C.F.R. § 391.41(b)(9).

her hours increased to twelve to fourteen hours per day, and
again to sixteen hours per day from September through December.
Because she had to train employees on all shifts, the Supervisor
sometimes had to work nights.

Anderson has not controverted any of these affidavits with
admissible evidence.  He has not provided any evidence that the
employees' duties are less onerous, or that hours required are
fewer than the employees said they are, or that the employees
have schedules which do not conflict with Dr. Jaffe's
limitations.  Nor, as with the written descriptions, does he
provide any evidence that he could meet the job requirements
about which the employees submitted affidavits.

As noted above, even if I were not to grant UPS's motion to
strike the evidence Anderson provided in his supplemental
submission, Anderson still cannot create a genuine issue of
material fact for trial.  In his supplemental submission,
Anderson points to one line of Ms. Niedbalski's deposition that
arguably supports his contention that there were part-time
supervisor positions available to him.  However, taken in
context, Ms. Niedbalski's statement is of no avail to Anderson.
She said, in relevant part:

> Q:   Let's say Mr. Anderson, prior to you ever having
>      any knowledge of his illness, would you have said
>      that he was qualified for this job?
> A:   I don't know his restrictions off the top of my
>      head.  I don't know if he had any temperature
>      humidity restrictions.  One thing I need to make

18

> clear is we have [Operations Management
> Specialists] that work day, night, morning, early
> morning hours so [they] don't work nine to five or
> nine to twelve.  We have [Operations Management
> Specialist] positions that work around the clock
> also.
>
> Q:   Apparently you have some that work part time,
>      correct?
> A:   Yes.
> Q:   Why couldn't Mr. Anderson have done a part-time
>      job as an [Operations Management Specialist]?
> A:   Again, I don't know his restrictions.
> Q:   You do know his restrictions.
> A:   I do know hours restriction and he could have a
>      five-hour.
> Q:   Then there were jobs in the company that he could
>      have done?
> A:   I don't know if there were any openings that he
>      could have done in this facility.
> Q:   Are there other management positions that have
>      part-time functions?
> A:   Part-time supervisors in our hub operations?  Yes,
>      but again no day hours in our hub operations.

Notably, Ms. Niedbalski did not say that there were openings

for those positions during the relevant time.  Earlier in the

same deposition, Ms. Niedbalski stated that, in fact, there were

no job openings during the relevant time that fit Anderson's

restrictions:

> Q:   Did you identify any positions that exist that, if
>      they were open, he could meet?
> A:   No.
> Q:   There weren't any jobs that he could get with
>      those accommodation changes?
> A:   No.  If there were I would have communicated
>      those.

Moreover, the one position she did know about (the part-time

supervisor in hub operations) would still not meet Anderson's

restrictions because it was a night-time position.

Even if there were openings (and assuming that the document was authenticated), the "Essential Job Functions" list for the Operations Management Specialist notes that a requirement for the position is that the employee "demonstrate cognitive ability to . . . concentrate, memorize, and recall." Both Anderson and Dr. Jaffe admitted that Anderson's bipolar disorder made it difficult for him to concentrate and remember details. Thus, neither Ms. Niedbalski's deposition nor the "Essential Job Functions" list for the Operations Management Specialist creates a genuine issue of material fact sufficient to survive summary judgment.

Anderson's affidavit also does not create a genuine issue of material fact. In his new affidavit, Anderson states that while he was at UPS, "there were part time positions for supervisors," and concludes that he "was qualified" for the Hub Supervisor and Local Sort Supervisor positions. He asserts that he "believed[d]" that the Hub Supervisor positions "were part time positions." Anderson also claims that he "could have performed" the "twi shift" which ran from 4:00 p.m. to midnight as a Hub Supervisor or Air Ramp Supervisor.

None of this helps Anderson, however. First, his statements that he could have performed the listed jobs are conclusory, without a developed factual basis, and do not create genuine issues of material fact. *Sullivan*, 561 F.3d at 14 (noting that "conclusory allegations, improbable inferences, and unsupported

speculation" are insufficient to create a genuine issue of material fact). Second, Anderson's conclusion that he could work the "twi shift" is contradicted by Dr. Jaffe's letter, which stated that he could not work nights. Third, Anderson does not say that any of the part-time jobs he "could have performed" had openings during the relevant time period. As noted above, there is ample evidence in the record that there were no such openings. Anderson's new affidavit cannot create a genuine issue of material fact even if incorporated into that record.

C.   Application of Summary Judgment Standard

On a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). No genuine issue for trial exists concerning the question whether Anderson could perform the "essential functions" of the jobs for which he applied, or could have applied, because Anderson failed to provide any significant evidence to counter UPS's affidavits. Without such evidence, no "reasonable jury could return a verdict for" Anderson, and therefore summary judgment is appropriate for UPS. *Anderson*, 477 U.S. at 248.

### V.   CONCLUSION

For the reasons set forth more fully above, I (1) GRANT UPS's motion to strike (Dkt. No. 29); (2) GRANT UPS's motion for

summary judgment (Dkt. No. 18); and (3) DENY Anderson's cross

motion for summary judgment (Dkt. No. 24).


**_/s/ Douglas P. Woodlock_**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE